UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

                              Plaintiff,

        -v-                                    1:05-CV-1270

GENERAL ELECTRIC COMPANY,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TOWN OF FORT EDWARD,

                              Intervenor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


APPEARANCES:                        OF COUNSEL:

HON. GLENN T. SUDDABY               BARBARA D. COTTRELL, ESQ.
United States Attorney for the      WILLIAM H. PEASE, ESQ.
    Northern District of New York   Ass't United States Attorneys
Attorney for Plaintiff
218 James T. Foley U.S. Courthouse
Room 231
445 Broadway
Albany, NY 12207-2924

UNITED STATES DEPT. OF JUSTICE      BRIAN G. DONOHUE, ESQ.
ENRD/EES                            PETER K. KAUTSKY, ESQ.
Attorney for Plaintiff
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044

SPRIGGS & HOLLINGSWORTH             DONALD W. FOWLER, ESQ.
Attorneys for Defendant             STEPHEN A. KLEIN, ESQ.
1350 I Street, N.W., 9th Floor
Washington, DC 20005

GREENBERG TRAURIG, LLP                    HENRY M. GREENBERG, ESQ.
Attorneys for Defendant
54 State Street
Albany, NY 12207

COUNSEL FOR GENERAL ELECTRIC            MICHAEL S. ELDER, ESQ.
Attorney for Defendant                   SHERI L. MORENO, ESQ.
General Electric Company
310 Great Oaks Blvd., Suite 319
Albany, NY 12203

MCNAMEE, LOCHNER, TITUS                  JOHN J. PRIVITERA, ESQ.
   & WILLIAMS, P.C.
Attorneys for Intervenor
677 Broadway
Albany, NY 12207-2503

MARK J. SCHACHNER, ESQ.
Attorney for Intervenor
451 Glen Street, Box 765
Glens Falls, NY 12801

HON. ELIOT SPITZER                        KATHERINE HUDSON, ESQ.
Attorney General for the State of New York   EUGENE J. LEFF, ESQ.
Attorney for Proposed Amicus State of New York   Ass't Attorneys General
 The Capitol
Albany, NY 12224-0341


DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

        The United States of America brought this action against General Electric Company

("GE") pursuant to the Comprehensive Environmental Response, Compensation, and

Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675.  It sought injunctive relief and recovery of

response costs.  A hearing on the issues, described in detail below, was held in Utica, New

York, on August 2, 2006.  Decision was reserved.

## II.  **FACTUAL BACKGROUND**

The following facts are as alleged in the complaint and as set forth in the record. The background facts are not in contention.

GE operated two capacitor manufacturing facilities along the upper Hudson River in New York State.  GE used polychlorinated biphenyls ("PCBs") in its operations.  Over a period of about thirty years, ending in 1977, GE discharged oils containing PCBs both directly and indirectly into the Hudson River.  The total quantity of PCBs discharged directly into the river has been estimated to be as high as 1,330,000 pounds (approximately 605,000 kilograms).

PCBs introduced into the river adhere to sediments, with some fraction being carried in the water column.  PCBs are hazardous substances within the meaning of CERCLA.  42 U.S.C. § 9601(14).  PCBs have been detected in the Hudson River from the Village of Hudson Falls ("Hudson Falls") in the north to the Battery in New York City in the south, leading to the designation of an almost 200 river-mile stretch of the river as the Hudson River PCBs Superfund Site ("Site") pursuant to CERCLA.  See 26 U.S.C.A. § 9507 (2002) (establishing a Hazardous Substance Superfund); see also 42 U.S.C.A. § 9611 (2005) (setting forth uses for the Superfund).  PCBs have been found in water, sediments, plant life, animal life, and the soils at the Site.

Areas of Hudson River sediments upstream (north) of the former Fort Edward Dam also contain PCBs, after exposure to the contamination when the water level dropped following removal of the dam in 1973.  These five "Remnant Deposits" are included within the Site.  The Upper Hudson River portion of the Site covers just over 43 river miles from the Fenimore Bridge in Hudson Falls to the Federal Dam at Troy.  The Lower Hudson River

portion of the Site begins at the Federal Dam at Troy and continues to the southern tip of Manhattan at the Battery in New York City.

In September 1984 the United States Environmental Protection Agency ("EPA") placed the Site on the National Priorities List.  See 42 U.S.C.A. § 9605(a)(8)(B) (2005).  It then issued a Record of Decision ("1984 ROD") for the Site.  The 1984 ROD required a detailed evaluation of the Waterford Water Works public water supply treatment facility.  The New York State Department of Environmental Conservation ("NYS DEC"), funded by the EPA, conducted a study at the Waterford Water Works and concluded that standards applicable to public water supplies were met.

The 1984 ROD also required in-place capping, containment, and monitoring of exposed sediments (the Remnant Deposits), as well as stabilization of associated riverbanks and revegetation of the areas.  Pursuant to a 1990 consent decree, GE completed the remediation for the Remnant Deposits called for by the 1984 ROD.  It continues to conduct maintenance and long-term monitoring pursuant to that consent decree.

An interim "No Action" remedy was selected for the Hudson River sediments because of uncertainty surrounding reliability and effectiveness of technologies available to remediate the contaminated river sediment.

In 1989 EPA initiated a reassessment and feasibility study, in part due to availability of improved technologies for sediment dredging and treatment.  EPA proposed a plan for sediment cleanup in the Upper Hudson River portion of the Site which called for dredging contaminated sediment.  The plan was released for comment.  Thousands of comments, both in favor of and opposed to dredging, were received.  GE strongly opposed dredging.

In February 2002, the EPA issued another Record of Decision ("2002 ROD") selecting a remedy for the Upper Hudson River portion of the Site.  The 2002 ROD requires targeted environmental dredging of about 2.65 million cubic yards of sediment (containing about 150,000 pounds of PCBs) from the river, in two phases.  The 2002 ROD called for the dredged sediment to be transported, by barge or in-river pipeline, to a sediment processing/transfer facility ("processing facility").  At the processing facility the sediment would undergo dewatering and stabilization prior to being sent to an appropriate, licensed off-site landfill for disposal.  Treated water would be returned to the river.  Transport of the dewatered sediment offsite for disposal would be by rail or possibly by barge.  Places in the river that were dredged would be backfilled with material that was brought in by barge or rail.

The 2002 ROD specified that the processing facility would be considered on site for purposes of the CERCLA permit exemption.  (2002 ROD at 90.)  Also, the EPA was tasked with selecting a site for the processing facility.

Completion of the remediation called for by the 2002 ROD was expected to take six years--one year for the phase one dredging and five years for phase two.  The cost of this remediation was estimated at $460 million.

In the first phase only about ten percent of the total dredging would take place. The 2002 ROD set Engineering Performance Standards, containing objective criteria, to assure that the dredging would comport with human health and environmental standards,[1] and would be timely completed.  External peer review of the phase one dredging in light of

---

[1] The Engineering Performance Standards set forth in the 2002 ROD address dredging-related resuspension of sediments from the river bottom, residual levels of PCBs subsequent to dredging, and the productivity of the dredging work.  In addition, the 2002 ROD set forth quality of life standards addressing light, noise, odor, traffic, and navigational concerns.

the Engineering Performance Standards would be conducted.  Additionally, a written report at the conclusion of phase one dredging would be subject to peer review to assure the effectiveness of the remedy as set forth in the Engineering Performance Standards. Necessary modifications would be made to the dredging process and/or performance standards.  Phase two dredging would then begin.

In July 2002 and August 2003 the United States and GE entered into Administrative Orders on Consent.  Pursuant to these orders on consent GE undertook a sediment sampling program, collecting over 50,000 samples.  GE also mapped the river sediment using side-scan sonar and other methods which, in combination with the sediment sampling, was used to target and refine dredging locations.  GE developed a remedial design for the ROD remedy comprised of a detailed plan for dredging, transport, and disposal of sediment as well as replacing the habitat.  Work plans for the design of dredging, baseline monitoring, cultural and archeological resources assessment, and habitat delineation and assessment were developed.  A community health and safety plan was also developed. Pursuant to the 2002 and 2003 orders on consent, GE reimbursed EPA for certain past costs and agreed to pay certain costs incurred by EPA in the future, totaling $35.625 million.

Meanwhile, the EPA proceeded to evaluate sites for a processing facility.  First locations had to be identified that met the requirements for a processing facility;  The site had to be appropriate to be used to transfer sediment from the river to a processing area, dewater the sediment, treat the water, and transfer the dewatered sediment to rail or barge for off-site disposal.  In December 2002 EPA issued a facility siting concept document identifying decision-making milestones including developing engineering and siting criteria, implementing community involvement activities, identifying and evaluating potential sites, and

conducting site-specific field investigations.  Twenty-four potential sites had been identified by June 2003.  Site visits were conducted and various data were evaluated to determine suitability (such as proximity of residences and rail facilities).  Potential sites were narrowed to a field of seven final candidates.  Additional evaluation was conducted bringing the final field to five.  The field was further narrowed to three after considering in particular the amount of useable acreage, rail yard suitability, waterfront suitability, environmental conditions, road access, and proximity to dredge areas.

In April 2004 the EPA released a Draft Facility Siting Report for a 90-day public comment period.  Five potential sites were specified as suitable and three were recommended.  An industrial area in the Town of Fort Edward ("Fort Edward") was among the three recommended potential sites.[2]  Comments were evaluated and further investigations were conducted.  The EPA then selected the Bethlehem and Fort Edward sites for processing facilities for the phase one remedy.  The Fort Edward site is located along the Champlain Canal approximately 1.4 miles from the Hudson River.[3]

After considerable negotiations, the proposed Consent Decree was agreed upon by the United States and GE.  The Consent Decree adopts the dredging remedy selected by the 2002 ROD.  It was published in the Federal Register pursuant to 28 C.F.R. § 50.7 and 42

---

[2]  The other recommended potential sites were in the Town of Schaghticoke, Rensselaer County and in Bethlehem, Albany County.

[3]  The Champlain Canal runs as a channel in and along the Hudson River for thirty-seven miles, from Waterford to Fort Edward.  At Fort Edward the Champlain Canal diverges from the river, cutting across land in a northeasterly direction for twenty-three miles until it meets the southern tip of Lake Champlain at Whitehall.
    The proposed location for the processing facility is on the northeastern extension of the canal, about 1-1/2 miles from where it diverges from the river.

U.S.C. § 9622(d).  See Notice of Lodging of Consent Decree, 70 Fed. Reg. 59771-01 (Oct. 13, 2005).

The proposed Consent Decree contains multitudinous provisions (it is more than 75 single-spaced pages long).  Of particular interest here is a provision that purports to exempt GE from any requirements for permits for work conducted entirely on-site.  This provision further specifies that the processing facility will be considered to be on-site for purposes of the CERCLA permit exemption.  It states:

> As provided in Section 121(e) of CERCLA and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work).  The Sediment Processing/Transfer Facility(ies) shall be considered on-site for purposes of the CERCLA Section 121(e) permit exemption.  Where any portion of the Work that is not on-site requires a federal or state permit or approval, Settling Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

(Proposed Consent Decree at 12 ¶ 8(a) (emphasis added.)  Thus, according to this provision of the Consent Decree, GE will not be required to obtain federal, state or local permits to build and operate the processing facility.

Pursuant to the Consent Decree, in addition to building a processing facility GE must perform phase one work consisting of limited dredging in the upper Hudson River, and processing and disposal of the dredged sediment as well as the follow-up evaluation set forth in the 2002 ROD.  However, the Consent Decree permits GE to opt out of performing work during phase two.  As explained by the government, the opt out provision was included because of the uncertainty of the scope of remediation (and its cost) during phase two due to the peer review and possibly resulting work plan changes.  The Consent Decree provides

that if GE opts out of phase two performance, then the government may use any available provision of law to accomplish the remedy, including, for example, issuing a unilateral administrative order, seeking injunctive relief requiring GE to perform the remedy, and performing the remedy itself using Superfund monies then suing GE for reimbursement. Thus, under the Consent Decree, GE's liability for remediation of the Hudson River PCBs Superfund Site is resolved only if it performs both phase one and phase two of the selected remedy.

Further, the Consent Decree sets forth stipulated penalties should GE fail to perform the required remediation.

In addition to performance of remediation relating to phases one and two, the Consent decree requires GE to pay up to $43,000,000 of costs incurred by EPA for phase one work and evaluation and, if GE elects to perform phase two, pay up to an additional $32,500,000 of  EPA's response costs for the remainder of the required remediation.  GE would also be responsible for payments relating to the CERCLA-required five-year follow-up reviews.  Thus, under the proposed Consent Decree GE has agreed to pay up to a total of $78 million of response costs incurred at the Hudson River PCBs Superfund Site in addition to the $37 million it has already paid pursuant to administrative orders on consent.

## III.  PROCEDURAL HISTORY

The United States filed the complaint in this action on October 6, 2005.  A proposed Consent Decree was filed on the same day.  On May 17, 2006, the United States moved for entry of the Consent Decree.  GE agreed not to oppose entry of or challenge any provision of the Consent Decree.

On June 2, 2006, Fort Edward moved to intervene to oppose entry of the Consent Decree so long as it contained paragraph 8(a), which, as described above, exempts the processing facility from federal, state or local permits that would otherwise be required.  Fort Edward argued that the permit exemption paragraph was illegal and unenforceable because the processing facility at the selected site could not be "entirely onsite" under CERCLA 121(e)(1).[4]  The United States agreed to Fort Edward's intervention request, turning the focus to the substantive issue of the permit exemption and the meaning of "entirely onsite."  On July 6, 2006, the motion to intervene was granted, giving Fort Edward the permission it sought to intervene for the limited purpose of challenging the permit exemption.  The order states:

> that the Town of Fort Edward is permitted limited intervention in this matter solely to present oral argument (as well as responsive pleadings) to this Court on July 28, 2006, with respect to whether the dewatering facility selected by the U.S. Environmental Protection Agency related to the sediment dredging project of the Upper Hudson River, is "on-site" for purposes of Section 121(e) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9621(e), and its supporting regulations.

(Order Docket No. 24.)  The United States filed a response to Fort Edward's objection to the permit exemption.  General Electric also made a submission in this regard.  Oral argument

---

[4]  The Complaint in Intervention states:

The Town intervenes herein because the May 17, 2006 proposed Judicial Consent Decree is illegal and unenforceable as a matter of federal law and local law in that it declares, without any basis in fact or law, that a massive proposed hazardous waste treatment facility, which would be built if the Judicial consent Decree is ordered by this Court, is "entirely on-site" when it is, in fact, in an entirely clean area of the Town, 1.4 miles away from the Hudson River PCB Site. . . .  The Town hereby seeks a declaratory judgment that the proposed Judicial Consent Decree is illegal, unenforceable and may not be "so ordered" by this Court so long as it contains the illegal and offensive paragraph 8(a).

(Compl. in Intervention ¶ 1.)

was heard on August 2, 2006.  Appearances were made by the United States, Fort Edward, General Electric, and proposed amicus State of New York.  It was noted that Fort Edward's motion to intervene had been granted.  Decision on the motion to enter the Consent Decree was reserved.

## IV.  DISCUSSION

### A.  Statutory & Regulatory Framework

CERCLA 121(e)(1) states that other permits are not required for remediation that takes place "entirely onsite."  Specifically, the statute provides that "[n]o Federal, State, or local permit shall be required for the portion of any removal or remedial action conducted entirely onsite, where such remedial action is selected and carried out in compliance with this section."  42 U.S.C. § 9621(e)(1).  EPA regulations repeat the "entirely onsite" permit exemption.  Hazardous Substances Response Rules, 40 C.F.R. § 300.400(e) (2006).  The EPA rules go on to define onsite:  "The term *on-site* means the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the response action."  Id.

### B.  Standard of Review

In reviewing a proposed consent decree, a district court must determine if it "is fair, reasonable, and faithful to the objectives of" CERCLA.  United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990); see Publicker Indus. Inc. v. United States (In re Cuyahoga Equip.), 980 F.2d 110, 119-20 (2d Cir. 1992) (finding that the lower court "acted within its discretion in approving the settlement agreement as fair, reasonable and consistent with CERCLA's objectives").

The fairness inquiry has two facets, procedural and substantive fairness.  Cannons

Eng'g Corp., 899 F.2d at 86.  To determine procedural fairness the negotiation process is

reviewed to "gauge its candor, openness, and bargaining balance."  Id.  Substantive fairness

deals with "corrective justice and accountability; a party should bear the cost of the harm for

which it is legally responsible."  Id. at 87.

Evaluation of the reasonableness of a proposed CERCLA consent decree also has

multiple facets.  Id. at 89.  For example, the "technical adequacy, primarily concerned with

the probable effectiveness of proposed remedial responses," must be considered.  Id. at 89-

90.  Also important considerations are whether the settlement "compensates the public for

the actual (and anticipated) costs of remedial and response measures," and whether a

settlement that does not fully compensate for costs is nonetheless a cost-effective alternative

to litigation that will conserve public and private resources.  Id. at 90.

CERCLA has two main objectives:  "to encourage prompt and effective responses

to hazardous waste releases and to impose liability on responsible parties."  In re Cuyahoga

Equip., 980 F.2d at 119; Cannons Eng'g Corp., 899 F.2d at 90-91.  It is apparent that

consideration of CERCLA's objectives overlays determinations of both fairness and

reasonableness.

Moreover, in evaluating the proposed Consent Decree, deference is accorded to a

government agency, such as the EPA, and other parties proposing the settlement.  In re

Cuyahoga Equip., 980 F.2d at 118 (citing Chevron, U.S.A. Inc. v. Natural Res. Def. Council,

467 U.S. 837, 842-44, 104 S. Ct. 2778, 2781-82 (1984); Cannons Eng'g Corp., 899 F.2d at

84)).  Further, the policy of encouraging settlements is particularly strong where the

settlement is proposed by a government agency acting in the public interest.  Id.; Cannons Eng'g Corp., 899 F.2d at 84.

### C. Analysis

As noted previously, the proposed Consent Decree is a long and detailed compromise for remediation of the PCB-laden Hudson River reached after lengthy negotiations between the EPA and GE.  The government has submitted a lengthy and detailed memorandum addressing the objections lodged during the public comment period and demonstrating how the Consent Decree is fair and reasonable in light of those comments.  Deference must be accorded to the government's recommendation that the Consent Decree be entered.

There is no indication that there was any flaw in the negotiation process that would render it procedurally unfair.  For example, in 1989 when the EPA released its proposed plan for remediation which included dredging contaminated sediment, thousands of comments were received on both sides of the issue.  GE was opposed to dredging.  However, as technology improved and GE conducted testing of the sediment, GE became committed to the dredging remedy and now supports entry of the Consent Decree.  There is no reason to speculate that the parties were anything but candid and open throughout the negotiations.  Further, the bargaining balance is fairly even with the government in a strong bargaining position and GE being a large company with substantial resources.  The negotiation process was procedurally fair.

The proposed Consent Decree is also substantively fair.  PCBs were introduced into the Hudson River at GE's capacitor manufacturing plants at Hudson Falls and Fort Edward; there is no assertion to the contrary.  Thus, GE is bearing the cost of the harm by

agreeing to conduct remediation and make payment to the United States for costs it has and will incur related to the remediation.  The Consent Decree effectively holds GE accountable for the hazardous substance contamination of the river.  The Consent Decree is both procedurally and substantively fair.

As to reasonableness, no question has been raised about the technical adequacy of the remedy.  (See, e.g., Intervenor's Mem. Support at 3 (stating that "the Town supports this remedy."))  In fact, in the early stages of planning for the clean-up of the river, no remedy for the sediment was chosen.  Rather, selection of the remedy was delayed until technological advances were made that provided a feasible and effective remedy.  Also, review processes are in place to evaluate the effectiveness of the dredging remedy after phase one and make adjustments to improve effectiveness if necessary prior to beginning phase two.  Because of the review and adjustment process built into the remedy it is impossible to accurately predict the cost for phase two.  However, GE has agreed to either conduct the phase two remediation or be liable for the response costs incurred by EPA in conducting phase two, thereby compensating for anticipated costs.

Additionally, GE has completed remediation of the Remnant Deposits called for in the 1984 ROD and it continues maintenance and monitoring of those areas.  It has undertaken sediment sampling and river sediment mapping programs to target and refine dredging locations pursuant to administrative orders on consent.  It has incurred the costs associated with completing the Remnant Deposit remediation and the sampling and mapping programs.  It also has reimbursed EPA for certain past costs incurred and agreed to reimburse certain future costs.  Under the proposed consent decree GE will pay up to $78

million to cover government costs, in addition to the $37 million already paid.  These payments and the work GE will perform go far in compensating the public.

Further, approval of the Consent Order will allow remediation to go forward after many years of delay.  The compromise represented by the Consent Order is a cost-effective alternative to litigation that will allow government and GE resources to be spent on remediation rather than litigation.  In sum, the Consent Order is reasonable.  Finally, as demonstrated by the analysis above, the Consent Order is faithful to the CERCLA objectives of encouraging prompt and effective responses and imposing liability on responsible parties.

Intervenor Fort Edward argues that the proposed Consent Order is not fair and reasonable when viewed in conjunction with CERCLA Section 121, 42 U.S.C. § 9621(e)(1). The essence of its argument is that paragraph 8(a) of the Consent Order purports to designate the processing facility as "on site" (and exempt from permitting requirements) when, if built at the selected Champlain Canal location, it does not fall within the CERCLA definition of "entirely on site."  Fort Edward contends that a processing facility located at the Champlain Canal is not exempt under Section 121, but must be subject to federal, state, and local permit requirements.

As set forth above, CERCLA exempts remediation activities which occur "entirely onsite" from federal, state, and local permit requirements.  42 U.S.C. § 9621(e)(1).  EPA regulations define "on-site" as within "the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the response action."  40 C.F.R. § 300.400(e)(1).  This definition of "on-site" cannot be challenged.[5]  See

_____

[5] Because the regulations at issue cannot be challenged, arguments relating to the public comments to the proposed rule, which in effect challenge the rule, are immaterial.  For example, Fort

(continued...)

42 U.S.C. § 9613(a) (directing that review of EPA regulations pertaining to CERCLA may be challenged within ninety days of promulgation; otherwise, the regulations are not subject to review).  To restate the regulation in other words, in order to be considered on site, the location must be necessary, suitable, and in very close proximity to the contaminated area.

Here the contaminated area is the Hudson River.  There is agreement that the Champlain Canal location is suitable and convenient.  (Intervenor's Reply Mem. at 3 ("The Town agrees that the general location of the facility is suitable and convenient."))  It also is agreed that locating the processing facility near the river to efficiently handle the contaminated sediment dredged from the river, return the water removed from the sediment to the river, and transport the dewatered sediment to a disposal site is necessary to the dredging remedy.

Contention arises regarding whether it is in very close proximity to the contamination thereby meeting the definition of "on site" and whether it is "entirely on site" pursuant to CERCLA.

EPA contends that the Champlain Canal site is in close proximity to the contamination--the Hudson River sediment.  Further, the EPA has propounded its intent that any processing facility selected would be considered on site for purposes of CERCLA § 121(e), 42 U.S.C. §9621(e)(1), at least since issuance of the 2002 ROD defining it as such.

The Hudson River PCBs Superfund Site is almost 200 miles long.  In comparison to the overall size of the Site, a processing facility a mere 1.4 miles away could easily be considered to be in very close proximity.  Even compared to the 43-mile Upper Hudson River

---

[5](...continued)
Edward relies (in part) upon State of Ohio v. EPA, 997 F.2d 1520 (D.C. Cir. 1993).  However, State of Ohio was a challenge to a proposed regulation and its reasoning is inapposite here.

portion of the Site, a facility 1.4 miles from the river would be in very close proximity.  That the Champlain Canal is not contaminated with hazardous substances is irrelevant.  The EPA's view that the Champlain Canal location is in very close proximity to the contamination and therefore "on site" is reasonable.  Its interpretation of its regulations is entitled to deference.  See Chevron U.S.A. Inc., 467 U.S. at 844, 104 S. Ct. at 2782.

Fort Edward argues that the EPA's interpretation that the processing facility is "on site" does not comport with CERCLA's requirement that exempt remediation activities be "entirely" on site.  A plain reading of the statute illustrates the error in Fort Edward's argument.  Entirely means wholly or completely.  See Black's Law Dictionary 573 (8th ed. 2004).  Partially is the antonym of wholly and completely.  Thus, if the processing facility was not "entirely" on site it would be "partially on site."  If it were "partially on site" it would be part on site and part off site.[6]  The selected location for the processing facility at Champlain Canal is either "on site" or "off site."  It is clearly not "partially on site."  Rather, it is entirely on site.  The EPA's interpretation that the processing facility is "entirely" on site does comport with CERCLA § 121(e).

The location of the processing facility at Champlain Canal is necessary, suitable, and in very close proximity to the contamination, therefore meeting the EPA definition of "on site."  Also, contrary to Fort Edward's arguments, it is "entirely on site" within the meaning of CERCLA.

---

[6]  Although not at issue here, it seems apparent that the word "entirely" was included in Section 121 to assure that, to the extent that remediation activity takes place off site, permit requirements apply.

## V. **CONCLUSION**

Deference is accorded to the United States and GE as the parties proposing the settlement.  The proposed Consent Decree is both procedurally and substantively fair.  It also is reasonable and faithful to the objectives of CERCLA.  The Champlain Canal location selected for the processing facility is necessary, suitable, and in very close proximity to the contaminated Hudson River, thereby meeting the EPA definition of "on site."  This finding is not contrary to CERCLA provisions, because the processing facility is, in fact, "entirely" (not partially) on site.  Having given careful consideration to all the provisions of the proposed Consent Decree, it is determined that it is reasonable, fair, consistent with CERCLA, and in the public interest.

Accordingly, it is

ORDERED that

1.  The proposed Consent Decree is APPROVED; and

2.  The approved Consent Decree, filed simultaneously herewith, constitutes a Final Judgment pursuant to Fed. R. Civ. P. 54(b).


IT IS SO ORDERED.

_____
United States District Judge


Dated: November 2, 2006
         Utica, New York.