IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

NOV 02 2006

LAWRENCE K. BAERMAN, Clerk
UTICA

UNITED STATES OF AMERICA,

Plaintiff,

v.

GENERAL ELECTRIC CO.,

Defendant.

CIVIL ACTION NO. *1:05-CV-1270*

CONSENT DECREE

<u>TABLE OF CONTENTS</u>

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. PARTIES BOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV. DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V. GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VI. PERFORMANCE OF THE WORK BY SETTLING DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . 13

VII. REMEDY REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VIII. QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS . . . . . . . . . . . . . . . . . . . . . . 24

IX. ACCESS AND INSTITUTIONAL CONTROLS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

X. REPORTING REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

XI. EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS . . . . . . . . . . . . . . . . . . . . . . . . 34

XII. PROJECT COORDINATORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

XIII. ASSURANCE OF ABILITY TO COMPLETE WORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

XIV. CERTIFICATION OF COMPLETION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

XV. EMERGENCY RESPONSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

XVI. PAYMENTS FOR RESPONSE COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

XVII. INDEMNIFICATION AND INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

XVIII. FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

XIX. DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

XX. STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

XXI. COVENANTS NOT TO SUE BY PLAINTIFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

XXII. COVENANTS BY SETTLING DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

XXIII. EFFECT OF SETTLEMENT; CONTRIBUTION PROTECTION . . . . . . . . . . . . . . . . . . . . . 67

XXIV. CERTIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

XXV. ACCESS TO INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

XXVI. RETENTION OF RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

XXVII. NOTICES AND SUBMISSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

XXVIII. EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

XXIX. RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

XXX.  APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

XXXI.  COMMUNITY RELATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

XXXII.  MODIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

XXXIII.  LODGING AND OPPORTUNITY FOR PUBLIC COMMENT . . . . . . . . . . . . . . . . . . . . . . 75

XXXIV.  SIGNATORIES/SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

XXXV.  FINAL JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

## I. BACKGROUND

A.      The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607.

B.      The United States in its complaint seeks, *inter alia*: (1) reimbursement of costs incurred and to be incurred by EPA and the Department of Justice for response actions at the Hudson River PCBs Superfund Site (the "Site") in the State of New York, together with accrued interest; and (2) performance of response work by the defendant at the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 (as amended) ("NCP").

C.      In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of New York (the "State") by letter dated February 4, 2002 of negotiations with General Electric Company ("Settling Defendant") regarding the implementation of the remedial design and remedial action for the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree.

D.      In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), by letter dated February 4, 2002, EPA notified the U.S. Department of the Interior and the National Oceanic and Atmospheric Administration of negotiations with Settling Defendant regarding the release of hazardous substances that may have resulted in injury to the natural resources under Federal trusteeship at the Site and encouraged the trustees to participate in the negotiation of this Consent Decree.

E.      By entering into this Consent Decree Settling Defendant does not admit any liability to the Plaintiff or any other person or entity arising out of the transactions or occurrences alleged in the complaint, nor does it acknowledge that the release or threatened release of hazardous substance(s) at or from the Site constitutes an imminent or substantial endangerment to the public health or welfare or the environment.

F.      Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on September 21, 1984, 49 Fed. Reg. 37070.

G.      In September 1984, EPA issued a Record of Decision for the Site which included: (i) an interim no action decision with regard to polychlorinated biphenyls ("PCBs") in the sediments of the Upper Hudson River; (ii) in-place capping, containment, and monitoring of Remnant Deposit sediments, and stabilization of the associated riverbanks and revegetation of those areas; and (iii) a detailed evaluation of the Waterford Water Works treatment facilities, including sampling and analysis of treatment operations to see if an upgrade or alteration of the facilities was needed.

H.      Pursuant to a 1990 consent decree with EPA, Settling Defendant implemented the remedial action for the Remnant Deposits that was selected in the 1984 Record of Decision. Settling Defendant is conducting maintenance and long-term monitoring activities under that consent decree.

I.      NYSDEC, with EPA funding, conducted a treatability study at the Waterford Water Works. The study was released in 1990 and found that PCB concentrations in Hudson River water were below analytical detection limits after treatment at the Water Works and met standards applicable to public water supplies.

J.      In 1989, EPA decided to reassess the interim no-action decision in the 1984 Record of Decision with respect to PCB-contaminated Hudson River sediments. Beginning in 1990, EPA conducted a Reassessment Remedial Investigation and Feasibility Study which included, *inter alia*, analyses of the fate, transport, and human health and environmental risks associated with PCB contamination at the Site.

K.      In December 2000, EPA issued the Reassessment Feasibility Study ("FS") in which the Agency evaluated potential remedial alternatives to address PCB contamination at the Site. Concurrently with the Reassessment FS, EPA issued a Proposed Plan in which EPA identified its preferred remedial alternative for the Site.

L.      Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, on December 6, 2000 EPA published notice of the completion of the FS and of the Proposed Plan for remedial action in a major local newspaper of general circulation. EPA held a public comment period on the Proposed Plan and supporting information from December 12, 2000 through April 17, 2001. Copies of the transcripts of the public meetings are available to the public as part of the administrative record upon which EPA based the selection of the response action.

M.      On February 1, 2002, EPA issued a Record of Decision in which EPA selected a remedial action for the Site. The remedy selected in the ROD includes, *inter alia*, the targeted dredging and off-site disposal of PCB-contaminated sediment from the Upper Hudson River. In the ROD, EPA estimated that the remedial action will remove approximately 2.65 million cubic yards of such sediment from the Upper Hudson River. The State concurred on the remedy selected in the ROD. The ROD includes a responsiveness summary to the public comments received on the Proposed Plan. Notice of the final plan was published in accordance with Section 117(b) of CERCLA.

N.      On February 4, 2002, EPA issued a notice letter to Settling Defendant pursuant to the "special notice" procedures of Section 122(e) of CERCLA, 42 U.S.C. § 9622(e). The notice letter requested that Settling Defendant inform EPA as to whether it would voluntarily finance or perform the remedial design and remedial action for the selected remedy identified in the ROD, and reimburse the United States for Site-related past response costs, plus interest.

O.      On July 23, 2002, EPA signed Administrative Order on Consent Index No. CERCLA-02-2002-2023, pursuant to which the Settling Defendant agreed, *inter alia*, to conduct sampling, analysis, and geophysical characterization of Hudson River sediments.

P.      On August 13, 2003, EPA signed Administrative Order on Consent for Remedial Design and Cost Recovery, Index No. CERCLA-02-2003-2027, pursuant to which Settling Defendant agreed, *inter alia*, to perform remedial design activities needed for implementation of the remedial action selected in the ROD.

Q.      Based on the information presently available to EPA, EPA believes that the Work will be properly and promptly conducted by the Settling Defendant if conducted in accordance with the requirements of this Consent Decree.

R.     Solely for the purposes of Section 113(j) of CERCLA, the Remedial Action selected by the ROD and the Work to be performed by the Settling Defendant shall constitute a response action taken or ordered by the President.

S.     The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and implementation of this Consent Decree will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II. JURISDICTION

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b).  This Court also has personal jurisdiction over the Settling Defendant.  Solely for the purposes of this Consent Decree and the underlying complaint, Settling Defendant waives all objections and defenses that it may have to the jurisdiction of the Court or to venue in this District.  Settling Defendant shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

## III. PARTIES BOUND

2.     This Consent Decree applies to and is binding upon the United States and upon Settling Defendant and its successors and assigns.  Any change in ownership or corporate status of the Settling Defendant, including, but not limited to, any transfer of assets or real or personal property, shall in no way alter the Settling Defendant's responsibilities under this Consent Decree.

3.     Settling Defendant shall provide a copy of this Consent Decree to each contractor hired to perform the Work (as defined below) required by this Consent Decree and to each entity representing Settling Defendant with respect to the Work and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Consent Decree and applicable law.  Settling Defendant or its contractors shall provide written notice of the Consent Decree to all subcontractors hired to perform any portion of the Work required by this Consent Decree.  Settling Defendant shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work contemplated herein in accordance with this Consent Decree; provided, however, that for the purposes of this sentence, rail carriers shall not be considered contractors or subcontractors to Settling Defendant.  Notwithstanding the proviso in the preceding sentence, Settling Defendant shall remain responsible for ensuring that the sediments dredged in connection with the Remedial Action are properly disposed of at an approved off-site facility.  With regard to the activities undertaken pursuant to this Consent Decree, each contractor and subcontractor shall be deemed to be acting in connection with a contractual relationship with the Settling Defendant within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

3

IV. Definitions

4.      Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations as of the Effective Date of this Consent Decree.  Whenever terms listed below are used in this Consent Decree or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

"Approved Design Documents" shall mean the detailed plans and specifications for the Remedial Action that are approved by EPA pursuant to the RD AOC.  The Approved Design Documents are to include the Phase 1 Final Design Report, the Phase 2 Final Design Report, the Remedial Action Community Health and Safety Plans, the Environmental Monitoring Plans for Phases 1 and 2 of the Remedial Action, and any EPA-approved revisions or addenda to such documents.

"ATSDR" shall mean the Agency for Toxic Substances and Disease Registry.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 - 9675.

"Certification Unit" shall mean an area developed in accordance with EPA's April 2004 *Engineering Performance Standard for Dredging Residuals* (and as such areas may be modified, if at all, for Phase 2) for the post-dredging sampling program and the subsequent statistical evaluation of post-dredging surface sediment data.

"Consent Decree" shall mean this Consent Decree and all appendices attached hereto (listed in Section XXX).  In the event of conflict between the body (i.e., Sections I-XXXV) of this Consent Decree and any appendix, the body of this Consent Decree shall control.

"Day" shall mean a calendar day unless expressly stated to be a working day.  "Working day" shall mean a day other than a Saturday, Sunday, or Federal holiday.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

"Effective Date" shall be the effective date of this Consent Decree as provided in Paragraph 127.

"EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

"EPA Phase 1 Evaluation Report" shall mean the report to be prepared by EPA as described in subparagraph 13.b.

"Existing Contamination" shall mean any hazardous substances, pollutants or contaminants, present or existing on or under the Sediment Processing/Transfer Facility Property(ies) as of the date of signature of this Consent Decree by Settling Defendant, except that Existing Contamination does not include PCBs that moved from the Hudson River onto such Property(ies) as a result of natural forces.

"Federal Trustees for Natural Resources" shall mean the National Oceanic and Atmospheric Administration of the U.S. Department of Commerce, and the United States Fish and Wildlife Service and the National Park Service of the U.S. Department of the Interior.

4

"Fish Consumption Advisories and Fishing Restrictions" shall mean institutional controls that are required by the ROD and are implemented and/or modified by the responsible governmental authorities, including NYSDOH or other agency of the State, and that establish health advisories concerning PCBs and are related to the consumption of fish from the Hudson River and health-based restrictions related to fishing in the Hudson River.

"GE Phase 1 Evaluation Report" shall mean the report to be prepared by Settling Defendant pursuant to subparagraph 13.b.

"Institutional Controls" shall mean administrative and/or legal tools that limit land or resource use or otherwise help to minimize the potential for human exposure to contamination and protect the integrity of the remedy.  Institutional controls may include, but are not limited to, informational tools (such as fish consumption advisories), governmental controls (such as bans on fishing for consumption purposes), proprietary controls (such as easements and/or restrictive covenants), and contractual agreements.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a).  The applicable rate of interest shall be the rate in effect at the time the interest accrues.  The rate of interest is subject to change on October 1 of each year.

"Interim Response Costs" shall mean all direct and indirect costs (a) paid by EPA, or by the U.S. Department of Justice on behalf of EPA, in connection with the Site between July 1, 2004 (or June 27, 2004 with respect to EPA payroll costs and July 25, 2004 with respect to U.S. Department of Justice costs) and the Effective Date, or (b) incurred by such parties in connection with the Work Area prior to the Effective Date but paid after that date.

"Lower Hudson River" shall mean the Hudson River from the Federal Dam in Troy, New York (River Mile 153.9) downstream to the Battery in New York City.

"Managing Contractor(s)" shall mean the contractor(s) retained by Settling Defendant to assist it in managing the implementation of the Work under this Consent Decree.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Capped Phase 1 Costs" shall mean all direct and indirect costs, not inconsistent with the NCP, that EPA, or the U.S. Department of Justice on behalf of EPA, incurs: (1) to enforce this Consent Decree prior to the Phase 2 Election Date; and (2) to enforce any surviving obligations Settling Defendant has under the Consent Decree in the event that Settling Defendant notifies EPA pursuant to subparagraph 15.c., below, that Settling Defendant will not implement Phase 2 of the Remedial Action pursuant to this Consent Decree.

"Non-Capped Phase 2 Costs" shall mean all direct and indirect costs, not inconsistent with the NCP, that EPA, or the U.S. Department of Justice on behalf of EPA, incurs for one or more of the following purposes between the Phase 2 Election Date and the date of Certification of Completion of the Remedial Action pursuant to Paragraph 57, below: (a) to enforce this Consent Decree; (b) to engage in dispute resolution activities pursuant to Section XIX (Dispute

Resolution); (c) to take actions pursuant to Section XV (Emergency Response); and (d) to acquire real property interests, or to assist in the acquisition of real property interests, needed for the Remedial Action (including, but not limited to, the cost of attorney time and just compensation paid in connection with acquiring such real property interests).

"NYSDEC" shall mean the New York State Department of Environmental Conservation and any successor departments or agencies of the State.

"NYSDOH" shall mean the New York State Department of Health and any successor departments or agencies of the State.

"Operation, Maintenance and Monitoring" or "OM&M" shall mean all activities required to monitor and maintain the effectiveness of the Remedial Action in accordance with the Operation, Maintenance and Monitoring plans that are required pursuant to the SOW and approved by EPA, and all other activities required pursuant to those plans.

"Paragraph" shall mean a portion of this Consent Decree identified by an arabic numeral or an upper case letter.

"Party" or "Parties" shall mean the United States and/or the Settling Defendant.

"Past Response Costs" shall mean all direct and indirect costs not previously reimbursed by Settling Defendant, that EPA, the U.S. Department of Justice on behalf of EPA, or ATSDR, paid at or in connection with the Site through June 30, 2004 (or June 26, 2004 with respect to EPA payroll costs and July 24, 2004 with respect to U.S. Department of Justice costs), plus Interest on all such costs which has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Peer Review" shall mean the independent external peer review conducted in accordance with Paragraph 14 of this Consent Decree.

"Phase 1" shall mean all parts of the Remedial Action that are needed for the implementation and evaluation of the first construction season of remedial dredging at the Work Area. Phase 1 includes, but is not limited to, the dredging conducted during that season, the construction of the Sediment Processing/Transfer Facility(ies) needed for Phase 1 dredging, the processing and off-site disposal of such dredged sediments, the preparation and finalization of the Phase 1 Evaluation Reports, and the Peer Review.

"Phase 1 Engineering Performance Standards" shall mean the performance standards for dredging-related resuspension, dredging residuals and dredging productivity, including the associated action levels and sampling, monitoring, contingency, record keeping and/or reporting elements of those standards, that are set forth in EPA's April 2004 *Engineering Performance Standards* for the Site, as modified by the Performance Standards Compliance Plan Scope and the Remedial Action Monitoring Scope, which are attachments to the Statement of Work at Appendix B of this Consent Decree.

"Phase 1 Quality of Life Performance Standards" shall mean the performance standards for air quality, noise, odor, lighting and navigation, including the associated action levels and sampling, monitoring, contingency, record keeping and/or reporting elements of those standards, that are set forth in EPA's May 2004 *Hudson River PCBs Superfund Site Quality of Life Performance Standards*, as modified by the Performance Standards Compliance Plan Scope and the Remedial Action Monitoring Scope.

6

"Phase 1 RA Response Costs" shall mean all direct and indirect costs, not inconsistent with the NCP, that EPA, or the U.S. Department of Justice on behalf of EPA, or ATSDR, incurs prior to the Phase 2 Election Date, in connection with (a) reviewing or developing plans, reports and other items pursuant to this Consent Decree, verifying or overseeing the Work, or otherwise implementing or overseeing this Consent Decree; (b) conducting any other activities related to the Work, including but not limited to community relations activities (including the cost of maintaining EPA's Hudson River Field Office); (c) obtaining access for the Work required hereunder, or property interests for or relating to the Sediment Processing/Transfer Facility(ies) needed for the Remedial Action; (d) Institutional Controls relating to the Site; and (e) performing any other activities related to the Remedial Action, including but not limited to (i) preparation of EPA's Phase 1 Evaluation Report, and the Peer Review of the Phase 1 Evaluation Reports, (ii) evaluation of remedial operations with respect to the Phase 1 Engineering Performance Standards and the Phase 1 Quality of Life Performance Standards; and (iii) developing, evaluating and/or requiring adjustments to the remedial operations, the Phase 1 Engineering Performance Standards, the Phase 1 Quality of Life Performance Standards, and/or to the scope of Phase 2. Phase 1 RA Response Costs shall also include all Interim Response Costs, and all RD Response Costs, as defined in the RD AOC, which have not already been reimbursed by Settling Defendant and are not otherwise included within the definition, above, of Interim Response Costs. Phase 1 RA Response Costs include, but are not limited to, payroll costs, contractor costs (including annual allocation costs), interagency agreement costs, travel costs, laboratory costs, and the costs incurred, prior to the Phase 2 Election Date, pursuant to Sections VII, IX (including, but not limited to, the cost of attorney time and any monies paid to secure access and/or to secure or implement institutional controls including, but not limited to, the amount of just compensation), and XV. In addition, to the extent that the State participates in any of the activities covered by items (a)-(e) above pursuant to a Cooperative Agreement or Superfund State Contract with EPA, the costs not inconsistent with the NCP that EPA incurs, prior to the Phase 2 Election Date, under such Cooperative Agreement or Superfund State Contract are included within the meaning of Phase 1 RA Response Costs. Notwithstanding the foregoing, Phase 1 RA Response Costs do not include Past Response Costs, Non-Capped Phase 1 Costs or costs incurred by the United States in performing the Work pursuant to Paragraph 105 (Work Takeover).

"Phase 2" shall mean all parts of the Remedial Action that will be conducted after Phase 1.

"Phase 2 Election Date" shall mean the date when Settling Defendant notifies EPA, pursuant to subparagraph 15.c. of this Consent Decree, whether it will perform Phase 2 of the Remedial Action.

"Phase 2 Engineering Performance Standards" shall mean the performance standards established by EPA for dredging-related resuspension, dredging residuals and dredging productivity, including, but not limited to, the associated action levels and sampling, monitoring, contingency, record keeping and/or reporting elements of those standards, that EPA determines will apply to Phase 2 of the Remedial Action.

"Phase 2 Quality of Life Performance Standards" shall mean the performance standards established by EPA for air quality, noise, odor, lighting and navigation, including, but not limited to, the associated action levels and sampling, monitoring, contingency, record keeping and/or

reporting elements of those standards, that EPA determines will apply to Phase 2 of the Remedial Action.

"Phase 2 RA Response Costs" shall mean all direct and indirect costs, not inconsistent with the NCP, that EPA, or the U.S. Department of Justice on behalf of EPA, or ATSDR, incurs between the Phase 2 Election Date and the date of Certification of Completion of the Remedial Action pursuant to Paragraph 57, below, in connection with (a) reviewing or developing plans, reports and other items pursuant to this Consent Decree, verifying or overseeing the Work, or otherwise implementing or overseeing this Consent Decree; (b) conducting any other activities related to the Work, including but not limited to community relations activities (including the cost of maintaining EPA's Hudson River Field Office); (c) obtaining access for the Work required hereunder; (d) Institutional Controls relating to the Site; and (e) performing any other activities related to the Remedial Action.  Phase 2 RA Response Costs include, but are not limited to, payroll costs, contractor costs (including annual allocation costs), interagency agreement costs, travel costs, laboratory costs, and the costs incurred, between the Phase 2 Election Date and the date of Certification of Completion of the Remedial Action, pursuant to Sections VII and IX (including, but not limited to, the cost of attorney time and any monies paid to secure access and/or to secure or implement institutional controls).  In addition, to the extent that the State participates in any of the activities covered by items (a)-(e) above pursuant to a Cooperative Agreement or Superfund State Contract with EPA, the costs not inconsistent with the NCP that EPA incurs, between the Phase 2 Election Date and the date of Certification of Completion of the Remedial Action, under such Cooperative Agreement or Superfund State Contract are included within the meaning of Phase 2 RA Response Costs.  Notwithstanding the foregoing, Phase 2 RA Response Costs do not include Non-Capped Phase 2 Costs or costs incurred by the United States in performing the Work pursuant to Paragraph 105 (Work Takeover).

"Plaintiff" shall mean the United States.

"Post-Phase 2 Costs" shall mean all direct and indirect costs, not inconsistent with the NCP, that EPA, or ATSDR, or the U.S. Department of Justice on behalf of EPA, incurs in connection with the following activities: (a) conducting the first two periodic reviews pursuant to Paragraph 24, below, following the date of Certification of Completion of the Remedial Action pursuant to Paragraph 57, below; and (b) overseeing Settling Defendant's performance of, or conducting any other activities with respect to, OM&M from the date of Certification of Completion of the Remedial Action until the completion of the second of the two periodic reviews referred to in item (a) immediately above.

"RA Performance Standards" shall mean the Phase 1 Engineering Performance Standards, Phase 2 Engineering Performance Standards, Phase 1 Quality of Life Performance Standards, and Phase 2 Quality of Life Performance Standards; the Remedial Action Objectives and Remediation Goals set forth in Section 9.1 of the ROD; and the Applicable or Relevant and Appropriate Requirements ("ARARs") set forth or referred to in Tables 14-1 through 14-3 of the ROD (with the exception of those ARARs that were waived in the ROD based on technical impracticability (see ROD Section 14.2)).  RA Performance Standards also include the requirements set forth in the documents entitled "Substantive Requirements Applicable to Releases of Constituents not Subject to Performance Standards," "Substantive Requirements of State Pollutant Discharge Elimination System Permit for Potential Discharge to the Champlain

Canal (land cut above Lock 7)," and "Substantive Requirements of State Pollutant Discharge Elimination System Permit for Potential Discharge to the Hudson River," which EPA provided to Settling Defendant on January 7, 2005.

"RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901-6992k (also known as the Resource Conservation and Recovery Act).

"RD AOC" shall mean the Administrative Order on Consent for Remedial Design and Cost Recovery, Index No. CERCLA-02-2003-2027, which EPA issued to Settling Defendant on August 13, 2003.

"Record of Decision" and "ROD" shall mean the EPA Record of Decision for the Site (including all attachments thereto) that was signed on February 1, 2002 by the Administrator of EPA and the Regional Administrator of EPA Region 2.  The ROD is attached as Appendix A. Due to the large size of Part 3 of the ROD (the Responsiveness Summary), Appendix A includes an electronic copy (on CD-ROM), rather than a paper copy, of Part 3.

"Remedial Action" shall mean those activities, except for Remedial Design and Operation, Maintenance and Monitoring, to be undertaken to implement the ROD, in accordance with the SOW, the final Remedial Design plans and reports, the Remedial Action Work Plans, and other plans approved by EPA.

"Remedial Action Work Plans" and "RA Work Plans" shall mean the Remedial Action Work Plan for Phase 1 Dredging and Facility Operations (required pursuant to Section 2.3 of the SOW), the Remedial Action Work Plan for Phase 2, Year 1 Dredging and Facility Operations (required pursuant to Section 3.1 of the SOW), the Remedial Action Work Plan for Phase 2 Dredging and Facility Operations (required pursuant to Section 3.2 of the SOW), the Remedial Action Work Plan for Phase 1 Facility Site Work Construction (required pursuant to Section 2.1 of the SOW), the Remedial Action Work Plan for Phase 1 Processing Equipment Installation (required pursuant to Section 2.2 of the SOW) and the Remedial Action Work Plan for Phase 2 Facility Construction (required pursuant to Section 3.2 of the SOW), and any revisions and/or addenda thereto.

"Remedial Design" shall mean those activities undertaken to develop detailed plans and specifications for implementation of the Remedial Action.

"Remnant Deposits" shall mean the areas of PCB-contaminated sediment, designated by EPA in the ROD as Remnant Deposit Nos. 1 through 5, that are located in or adjacent to the Hudson River upstream of Rogers Island.

"Reserved OM&M Costs" shall mean all direct and indirect costs that the United States incurs, in connection with the following activities, subsequent to the time period described in the definition, above, of "Post-Phase 2 Costs": (a) conducting periodic reviews pursuant to Paragraph 24, below; and (b) overseeing Settling Defendant's performance of, or conducting any other activities with respect to, OM&M.

"Sampling AOC" shall mean Administrative Order on Consent, Index No. CERCLA-02-2002-2023, which EPA issued to Settling Defendant on July 23, 2002 with respect to the Site.

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

9

"Sediment Processing/Transfer Facility(ies)" shall mean the facility(ies) at which sediments that are dredged from the Upper Hudson River in connection with the Remedial Action will be dewatered, stabilized (if needed), and then transferred to an appropriate means of transportation for either off-site disposal or beneficial use.

"Sediment Processing/Transfer Facility Property(ies)" shall mean the real properties described in Appendix D.

"Settling Defendant" shall mean General Electric Company.

"Site" shall mean the Hudson River PCBs Superfund Site located in the State of New York.

"Special Account" shall mean the Hudson River PCBs Site Special Account established by EPA within the EPA Hazardous Substances Superfund.

"State" shall mean the State of New York.

"Statement of Work" or "SOW" shall mean the statement of work for implementation of the Remedial Action and Operation, Maintenance and Monitoring at the Site, including all attachments thereto, as set forth in Appendix B to this Consent Decree, and any modifications thereto made in accordance with this Consent Decree.

"United States" shall mean the United States of America.

"Upper Hudson River" shall mean the Hudson River and Champlain Canal from the Fenimore Bridge in Hudson Falls (River Mile 197.3) to the Federal Dam at Troy (River Mile 153.9); provided that the Upper Hudson River does not include (i) the floodplain of the Hudson River or Champlain Canal, other than those parts of the Hudson River shoreline where dredging as part of the Remedial Action will be performed; (ii) the Remnant Deposits; (iii) Settling Defendant's facilities in Hudson Falls and Fort Edward, New York; (iv) any locations in the Hudson River for which NYSDEC selected a remedy in its March 2004 Record of Decision for the GE Hudson Falls Plant Site and in its January 2000 Record of Decision for the GE Fort Edward Plant Site; (v) bedrock that is in the vicinity of Outfall 004 at the GE Fort Edward facility; and (vi) any other bedrock that is in the Upper Hudson River in the vicinity of Settling Defendant's Hudson Falls and Fort Edward facilities and which is or may be a source of PCBs to the Hudson River.

"USACE" shall mean the United States Army Corps of Engineers.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33), 42 U.S.C. § 9601(33); and (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

"Work" shall mean all activities Settling Defendant is required to perform under this Consent Decree, except those required by Section XXVI (Retention of Records). The Work includes Phase 2 if Settling Defendant notifies EPA, pursuant to subparagraph 15.c., below, that Settling Defendant will implement Phase 2 pursuant to this Consent Decree.

"Work Area" shall mean any area at or near the Site where the Work will be performed, including (i) the Hudson River and Champlain Canal from the upstream end of Rogers Island at

10

Fort Edward downstream to the Federal Dam at Troy (or, if a Sediment Processing/Transfer Facility is located south of the Federal Dam at Troy, then downstream to the area of the Hudson River which is adjacent to that facility); (ii) the Sediment Processing/Transfer Facility Property(ies); (iii) those locations in the Hudson River and Champlain Canal where sampling or monitoring activities that are part of the Work will be performed; (iv) the shorelines immediately adjacent to those portions of the Hudson River and Champlain Canal where the Work will be performed; and (v) routes across real property that are necessary for access to perform the Work. The Work Area does not include the floodplain of the Hudson River or Champlain Canal except insofar as those areas fall within the definition given in the preceding sentence.

## V. General Provisions

5.    Objectives of the Parties.  The objectives of the Parties in entering into this Consent Decree are to protect public health, welfare and/or the environment at the Site by the implementation of response actions at the Work Area by the Settling Defendant, to reimburse certain response costs of the Plaintiff, and to resolve the claims of Plaintiff against Settling Defendant to the extent provided in this Consent Decree.

6.    Commitments by Settling Defendant  Settling Defendant shall perform Phase 1 of the Remedial Action.  In addition, as provided in subparagraph 15.c., below, Settling Defendant may also perform Phase 2 of the Remedial Action.  Settling Defendant shall finance and perform the Work in accordance with this Consent Decree (including the attachments hereto), the Remedial Action Work Plans, and all other plans, standards, specifications, and schedules set forth or referenced herein or approved by EPA pursuant to this Consent Decree.  To the extent provided in this Consent Decree, Settling Defendant shall also reimburse the United States for Past Response Costs and other costs.  Work done in accordance with the SOW (including the attachments thereto), the submittals required by the SOW and approved by EPA, the Approved Design Documents, and the rest of this Consent Decree, shall be deemed to be done in accordance with the ROD; provided that this sentence does not affect any of the rights afforded to EPA elsewhere in this Consent Decree to require that changes be made to the SOW (including the attachments thereto) and/or to the Approved Design Documents. (For purposes of the preceding sentence only, the Consent Decree does not include the ROD.)

7.    Compliance With Applicable Law.

a.    All activities undertaken by Settling Defendant pursuant to this Consent Decree shall be performed in accordance with the requirements of all applicable federal and state laws and regulations.  Subject to subparagraph b., below, Settling Defendant must also comply with all ARARs identified in Tables 14-1 through 14-3 of the ROD which pertain to the activities undertaken by Settling Defendant pursuant to this Consent Decree, except to the extent that an ARAR was waived by EPA in the ROD (see Section 14.2 of the ROD).

b.    Under baseline conditions (that is, prior to the implementation of the Phase 1 and Phase 2 dredging), the federal water quality criterion of 0.014 µg/L for PCBs and the State water quality standard of 0.09 µg/L for PCBs, listed in Table 14-1 of the ROD, are sometimes exceeded in the water of the Hudson River below Rogers Island.  Based on the information known to EPA as of the date of lodging of this Consent Decree, EPA believes that the Remedial Action will lead to this water quality criterion and water quality standard being consistently met in the river water in that area.  Settling Defendant is not required by the second sentence of subparagraph 7.a.

11

above to perform any work, other than the work required pursuant to the SOW or otherwise required pursuant to this Consent Decree, for the purpose of attempting to achieve the 0.014 µg/L federal water quality criterion for PCBs or the 0.09 µg/L New York State Water Quality Standard that are identified on Table 14-1 of the ROD.

c.      The activities conducted pursuant to this Consent Decree, if approved by EPA, shall be considered to be consistent with the NCP.

8.      Permits.

a.      As provided in Section 121(e) of CERCLA and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). The Sediment Processing/Transfer Facility(ies) shall be considered on-site for purposes of the CERCLA Section 121(e) permit exemption. Where any portion of the Work that is not on-site requires a federal or state permit or approval, Settling Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.      Settling Defendant may seek relief under the provisions of Section XVIII (Force Majeure) of this Consent Decree for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit required for the Work.

c.      This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

9.      The ROD acknowledges that source control at Settling Defendant's Hudson Falls and Fort Edward plants is being addressed pursuant to State law. The ROD states further that, in the event that source control with respect to Settling Defendant's Hudson Falls facility is not successfully implemented pursuant to New York State law, EPA has authorized the performance of an Engineering Evaluation/Cost Analysis to evaluate options for a Non-Time Critical Removal Action at Hudson Falls pursuant to CERCLA in order to ensure that the PCB load to the river near Settling Defendant's Hudson Falls facility is significantly reduced. As of the United States' signature of this Consent Decree, it is EPA's expectation that if the source control measures at the Hudson Falls plant are successfully and timely implemented, no additional source control measures would be required at that plant, absent new information. Prior to EPA seeking to require any further source control actions at or near Settling Defendant's Hudson Falls plant or Fort Edward plant, EPA will: (i) notify Settling Defendant and the State of any deficiencies in the source control measures that have been or are being undertaken by the State under State law, or by Settling Defendant pursuant to any administrative agreements between the State and Settling Defendant, or of any releases of PCBs to the Hudson River from the Hudson Falls or Fort Edward plants (or from bedrock and/or soil in the vicinities of those plants) that are not being addressed by the State or pursuant to such administrative agreements, (ii) discuss with the State and Settling Defendant any such alleged deficiencies and the corrective measures and/or additional work that EPA deems necessary, and (iii) provide Settling Defendant with the opportunity to correct such deficiencies or perform such work. Any EPA decision regarding the need for or choice of such corrective measures or additional work shall not be subject to dispute resolution under Section XIX of this Consent Decree. Nothing in this Paragraph shall be construed as a covenant not to sue or to take administrative action by the United States.

## VI. PERFORMANCE OF THE WORK BY SETTLING DEFENDANT

10.    Selection of Managing Contractor(s).

a.    Settling Defendant shall retain one or more Managing Contractors to assist it in the management of the Work to be performed by Settling Defendant pursuant to Sections VI (Performance of the Work by Settling Defendant), VII (Remedy Review), VIII (Quality Assurance, Sampling and Data Analysis), and XV (Emergency Response) of this Consent Decree. The selection of the Managing Contractor(s) shall be subject to disapproval by EPA. Within 10 days after the Effective Date of this Consent Decree, Settling Defendant shall notify EPA in writing of the name, title, and qualifications of any contractor(s) proposed to be the Managing Contractor(s). The proposed Managing Contractor(s), as well as all other contractors and subcontractors who engage in the "practice of engineering" with respect to the Work on behalf of Settling Defendant, as the "practice of engineering" is defined at Section 7201 of the New York State Education Law, must comply with all applicable New York State legal requirements regarding the practice of engineering within the State of New York, including all applicable requirements of the New York State Education Law and Business Corporation Law.

b.    With respect to any contractor proposed to be a Managing Contractor, Settling Defendant shall demonstrate that, where relevant to that contractor's duties, the proposed contractor has a quality system that complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs," (American National Standard, January 5, 1995), by submitting a copy of the proposed contractor's Quality Management Plan (QMP). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by EPA. EPA will issue a notice of disapproval or an authorization to proceed. If at any time thereafter, Settling Defendant proposes to change a Managing Contractor, Settling Defendant shall give such notice to EPA including the name, title and qualifications of the proposed new Managing Contractor, and must obtain an authorization to proceed from EPA before the new Managing Contractor performs or manages any Work under this Consent Decree.

c.    If EPA disapproves a proposed Managing Contractor, EPA will notify Settling Defendant in writing. In such event, Settling Defendant shall submit to EPA a list of contractors, including the qualifications of each contractor, that would be acceptable to Settling Defendant within 30 days of receipt of EPA's disapproval of the contractor previously proposed. EPA will provide written notice of the names of any contractor(s) that it disapproves and an authorization to proceed with respect to any of the other contractors. Settling Defendant may select any contractor from that list that is not disapproved and shall notify EPA of the name of the contractor selected within 21 days of EPA's authorization to proceed.

d.    If EPA fails to provide written notice of its authorization to proceed or disapproval as provided in this Paragraph and this failure prevents the Settling Defendant from meeting one or more deadlines in a plan approved by the EPA pursuant to this Consent Decree, Settling Defendant may seek relief under the provisions of Section XVIII (Force Majeure) hereof.

13

11.   Remedial Design Plans and Reports.

a.      Notwithstanding any provision of the RD AOC, during the period between the lodging and the effective date of this Consent Decree, Settling Defendant shall provide review drafts of all deliverables under the RD AOC that relate to Phase 2 of the Remedial Action to EPA in accordance with the applicable schedule for submission of such deliverables under the RD AOC.  During this period, EPA and Settling Defendant shall discuss any EPA comments and any revisions requested by EPA.  If the parties agree on revisions to the deliverable in question, Settling Defendant shall make such revisions and submit a final version of the deliverable to EPA within 30 days of the date when the Parties agree on the revisions.  If, during the period between the lodging and effective date of this Consent Decree, EPA and Settling Defendant do not agree on revisions to the deliverable or EPA does not approve a final version of the deliverable, then Settling Defendant shall submit that deliverable for final EPA review no later than 15 days after the effective date of this Consent Decree.

b.      Notwithstanding any provision of the RD AOC, any disputes regarding deliverables submitted by Settling Defendant to EPA pursuant to the RD AOC for which the due date for the submission falls after the effective  date of this Consent Decree shall be subject to the dispute resolution procedures in Section XIX, below, rather than the dispute resolution procedures in the RD AOC.

c.      Each final Remedial Design plan and report that is submitted or finalized pursuant to the RD AOC shall be deemed incorporated into and become enforceable under this Consent Decree upon its approval by EPA and the completion of any dispute resolution regarding such document.

12.   Remedial Action.

a.      Settling Defendant shall implement Phase 1 of the Remedial Action in accordance with (1) this Consent Decree, including all attachments hereto (subject to Paragraph 6, above); (2) the Phase 1 Final Remedial Design plans and reports that have been or are approved or finalized by EPA pursuant to the RD AOC; (3) the Remedial Action Work Plans for Phase 1; and (4) all other work plans, schedules and other requirements relating to Phase 1 which are approved by EPA pursuant to this Consent Decree.  The plans, reports and other requirements referred to in clauses (2), (3) and (4) of this subparagraph shall be consistent with the SOW, and the plans, reports and other requirements referred to in clauses (3) and (4) shall also be consistent with the Phase 1 Final Remedial Design plans and reports that have been or are approved or finalized by EPA pursuant to the RD AOC.

b.      If Settling Defendant notifies EPA, pursuant to subparagraph 15.c. of this Consent Decree, that it will perform Phase 2 of the Remedial Action, Settling Defendant shall implement Phase 2 in accordance with: (1) this Consent Decree, including all attachments hereto (as the SOW may be modified following the Phase 1 dredging); (2) the Phase 2 Final Remedial Design plans and reports that have been or are approved or finalized by EPA pursuant to the RD AOC, as such plans and reports may be modified (in accordance with subparagraph 15.b., below, and/or Section 3 of the SOW) following the Phase 1 dredging; (3) the Remedial Action Work Plans for Phase 2; and (4) all other work plans, schedules and other requirements relating to Phase 2 which are approved by EPA pursuant to this Consent Decree.  The Phase 2 Final Remedial Design plans and reports shall be consistent with the SOW.  Any revisions and/or addenda to the Phase 2 Final

14

Remedial Design plans and reports (after the EPA decision described in subparagraph 15.b) shall be consistent with the SOW as it may be modified following the Phase 1 dredging.  In addition, the plans, reports and other requirements referred to in clauses (3) and (4) of this subparagraph shall be consistent with the SOW and the Phase 2 Final Remedial Design plans and reports, as the SOW and such plans and reports may be modified following the Phase 1 dredging.

       c.      Settling Defendant shall submit to EPA and the State all plans, submittals, or other deliverables required under the SOW in accordance with the applicable deadlines for such submissions.

       d.      Unless otherwise directed by EPA, Settling Defendant shall not commence any physical Remedial Action activities prior to EPA's approval of the work plan(s) for such work.

      13.     <u>Phase 1 Evaluation Reports</u>

       a.      Within 30 days after Settling Defendant completes one month of Phase 1 dredging at the estimated full production rate for Phase 2, Settling Defendant shall provide to EPA a Phase 1 Data Compilation which compiles all the data collected during Phase 1 up to and including that date and that are relevant to the issues identified in subparagraph 14.b., below, and any other topics that EPA has agreed should be included in the charge to the Peer Review Panel.

       b.      Within 60 days after Settling Defendant completes one month of Phase 1 dredging operations at the estimated full production rate for Phase 2, EPA and Settling Defendant will each finalize a complete draft of its Phase 1 Evaluation Report (individually, "EPA Phase 1 Evaluation Report" and "GE Phase 1 Evaluation Report") and provide such draft report to the other Party in electronic form.  Each Phase 1 Evaluation Report will include an evaluation of the Phase 1 dredging operations with respect to the Phase 1 Engineering Performance Standards; set forth proposed changes to the Phase 1 Engineering Performance Standards if appropriate; and in general, evaluate the experience gained from the Phase 1 dredging operations insofar as such information is relevant to the issues identified in subparagraph 14.b. and any other issues that EPA has agreed should be encompassed in its charge to the Peer Review panel.

       c.      The Parties shall have 14 days (or a longer period, if agreed to by the Parties) after receipt of the draft Phase 1 Evaluation Reports to provide written comments to each other on those reports.  The Parties shall have 10 days following receipt of such comments to have discussions regarding the content, findings and conclusions of the draft Phase 1 Evaluation Reports.  EPA and Settling Defendant will incorporate into the Phase 1 Evaluation Reports those changes and/or additions on which EPA and Settling Defendant have reached agreement, if any.

      14.     <u>Peer Review</u>

       a.      The Peer Review will evaluate the Phase 1 Evaluation Reports.  The Peer Review will be conducted in accordance with EPA's Science Policy Council Handbook: Peer Review (December 2000), or any applicable updates thereto; the Office of Management and Budget's *Final Information Quality Bulletin for Peer Review* (December 16, 2004), or any applicable updates thereto; and the provisions of this Paragraph.

b.      The Peer Review panel shall, at a minimum, address the issues raised by the following questions:

(1)     Does the experience in Phase 1 show that each of the Phase 1 Engineering Performance Standards can consistently be met individually and simultaneously?

(2)     If not, and if EPA and/or Settling Defendant has proposed modified Engineering Performance Standards, does the experience in Phase 1 and any other evidence before the panel show that it will be practicable to consistently and simultaneously meet the Engineering Performance Standards that are being proposed for Phase 2?

(3)     If the experience in Phase 1 and other evidence before the panel does not show that it will be practicable to consistently and simultaneously meet the Engineering Performance Standards that are being proposed for Phase 2, can the Phase 1 Engineering Performance Standards be modified so that they could consistently be met in Phase 2, and, if so, how?

(4)     If EPA and/or Settling Defendant has proposed modifications to the monitoring and sampling program for Phase 2, are the proposed modifications adequate and practicable for determining whether the Phase 2 Engineering Performance Standards will be met?

c.      The members of the Peer Review panel shall be selected by a neutral person ("the Peer Review Selector") chosen by agreement between EPA and Settling Defendant. If EPA and Settling Defendant cannot agree on a Peer Review Selector within 21 days of the lodging of this Consent Decree, then EPA will choose the Peer Review Selector. In selecting member(s) for the Peer Review panel, the Peer Review Selector shall select persons who have expertise relevant to the nature and scope of the review to be undertaken and shall endeavor to ensure that all relevant areas of expertise are represented on the panel. Panel members shall be impartial, and must not have a conflict of interest. Prior to the Peer Review Selector's selection of Peer Review panel members, both EPA and Settling Defendant will have an opportunity to identify to the Peer Review Selector the appropriate areas of expertise of Peer Review panel members and to recommend to the Peer Review Selector potential members for the panel. The members of the Peer Review panel that reviewed EPA's October 2003 draft Engineering Performance Standards shall be considered for membership on the Peer Review panel. In addition, the Peer Review Selector shall consider for selection such persons as are recommended by EPA or Settling Defendant. Neither EPA nor Settling Defendant shall have *ex parte* communications with the members of the Peer Review panel. Following selection of the panel members, EPA's Peer Review Contractor (a separate entity from the Peer Review Selector) shall manage the conduct of the peer review.

d.      The Peer Review panel will not evaluate whether the Remedial Action will, or may, achieve the human health and/or environmental objectives of the ROD, nor will the Peer Review panel evaluate whether Phase 2 should be implemented.

e.      EPA will provide Settling Defendant an opportunity to submit proposed charge questions to EPA prior to EPA's finalization of the charge to the Peer Review panel.  EPA also will provide Settling Defendant with an opportunity to review and comment to EPA on EPA's draft charge questions prior to their finalization.  EPA will prepare the final charge questions for the Peer Review panel.  The charge shall include, at a minimum, questions that are in substantially the same form as the questions identified in subparagraph 14.b., above.

f.      EPA will release the Phase 1 Evaluation Reports to the public, and the Peer Review Contractor will release the Phase 1 Evaluation Reports to the Peer Review panel.  EPA will accept public comments on the Phase 1 Evaluation Reports for a period of not less than 30 days.  EPA will compile public comments received on the Phase 1 Evaluation Reports and the Peer Review Contractor will make such comments (along with any written response that EPA and/or Settling Defendant chooses to provide to such comments) available to the Peer Review panel during the period of its review.  When making such public comments available to the Peer Review panel, the Peer Review Contractor will ensure that Settling Defendant's comments, if any, are clearly identified.

g.      The members of the Peer Review panel shall be provided a reasonable and adequate time to conduct the Peer Review.

h.      EPA will provide Settling Defendant and the public with an opportunity to express their views orally to the Peer Review panel on the issues in the charge questions.  At a minimum:

(1)    If the Peer Review Contractor holds an introductory meeting for the Peer Review panel, then Settling Defendant will be given two hours at such meeting to present a review and summary of the Phase 1 data and of Settling Defendant's experience during Phase 1 insofar as such information is relevant to the charge questions; provided , however, that if EPA makes a presentation to the Peer Review panel at the introductory meeting and such presentation lasts longer than two hours, then Settling Defendant shall be given the same amount of time as EPA to present to the panel, up to a maximum of four hours for Settling Defendant's presentation.

(2)    In lieu of holding an introductory meeting for the Peer Review panel, the Peer Review Contractor may initiate the Peer Review panel's review by transmitting to the panel members, by mail or electronic mail, the Phase 1 Evaluation Reports and the charge.  If the Peer Review Contractor plans to do so, then EPA will give Settling Defendant an opportunity to provide the Peer Review Contractor with written or electronic presentation materials that the Peer Review Contractor will forward to the Peer Review panel members.  If Settling Defendant elects to prepare such materials, it must submit such materials to EPA and the Peer Review Contractor no later than 25 days after the later of (i) the date that EPA transmits the draft charge to Settling Defendant, or (ii) the date on which EPA and Settling Defendant exchange draft Phase 1 Evaluation Reports.  The Peer Review

17

Contractor will transmit Settling Defendant's presentation materials, if any, to the Peer Review panel when the Peer Review Contractor forwards the Phase 1 Evaluation Reports and the charge to the Peer Review panel. Any such presentation materials that Settling Defendant submits to the Peer Review Contractor may only be concerned with topics identified in subparagraph 14.b., above, and any other topics that EPA has agreed should be encompassed in its charge to the Peer Review.

(3)    When the Peer Review panel is deliberating in public, the Peer Review Contractor shall inform the panel that it is free to request clarification from EPA with respect to the EPA Phase 1 Evaluation Report or the charge, from Settling Defendant with respect to the GE Phase 1 Evaluation Report and from EPA and Settling Defendant regarding information contained in and issues raised by their respective presentations to the panel under subsections (1) and (2), above, that are germane to the issues raised by the charge.

(4)    On the initial day of the Peer Review panel's public deliberations, Settling Defendant will be given at least two hours to present its views on the charge questions to the Peer Review panel.

(5)    On the final day of the Peer Review panel's public deliberations, prior to the panel's presentation of its final recommendations with respect to the charge questions, Settling Defendant will be given at least one hour to present its views on the charge questions to the Peer Review panel.

i.    All monitoring and other data and information collected during the Phase 1 dredging with respect to the Phase 1 Engineering Performance Standards will be available to the Peer Review panel through the Peer Review Contractor.

j.    After the Peer Review, the Peer Review Contractor will issue a report (the "Peer Review Report") that will state the Peer Review panel members' conclusions and recommendations with respect to the charge questions. Such report shall be released simultaneously to EPA, Settling Defendant and to the public, and EPA's response, if any, to such report, will also be made available to the public.

15.    Phase 2

a.    Following the Phase 1 dredging, EPA will provide Settling Defendant with an opportunity to discuss with EPA the changes that EPA believes are appropriate, if any, to the Phase 1 Engineering Performance Standards, the Phase 1 Quality of Life Performance Standards, the SOW, and/or the scope of Phase 2, before EPA makes a decision regarding such changes.

b.    After providing Settling Defendant with an opportunity for discussion in accordance with the preceding subparagraph, and after the Peer Review, EPA will notify Settling Defendant, in writing, of EPA's decision regarding changes, if any, to the Phase 1 Engineering Performance Standards, the Phase 1 Quality of Life Performance Standards, the SOW, and the

18

scope of Phase 2.  Within thirty (30) days of Settling Defendant's receipt of such notification or within such other time as agreed to by the Parties, Settling Defendant shall submit to EPA, for review and approval, the documents required by Section 3.1.1.1 of the SOW.

       c.     No later than August 1, 2008, Settling Defendant shall provide written notice to EPA and the State stating unequivocally whether Settling Defendant will implement, pursuant to this Consent Decree, Phase 2 of the Remedial Action; provided, however, that if EPA does not provide Settling Defendant by June 1, 2008  with written notification of EPA's decision regarding changes, if any, to the Phase 1 Engineering Performance Standards, the Phase 1 Quality of Life Performance Standards, the SOW, and the scope of Phase 2, Settling Defendant shall have until 90 days after its receipt of such written notification to notify EPA and the State, unequivocally and in writing, as to whether Settling Defendant will implement, pursuant to this Consent Decree, Phase 2 of the Remedial Action.  If Settling Defendant notifies EPA that it will implement Phase 2 under this Consent Decree, then Settling Defendant shall proceed to implement and complete that work, in accordance with the SOW and the other requirements of this Consent Decree.  Settling Defendant may not invoke the dispute resolution procedures of Section XIX, below, with respect to whether EPA's notification pursuant to subparagraph 15.b., above, is sufficient to trigger (i) the period for Settling Defendant to provide the notification required by this subparagraph c., or (ii) Settling Defendant's obligation to submit the documents pursuant to subparagraph 15.b., above.

       16.     To help ensure that there is no delay in the transition between Phase 1 and Phase 2 of the Remedial Action, Settling Defendant agrees to undertake those activities necessary to efficiently prepare for the remobilization of contractors and equipment that will be needed to undertake Phase 2 of the Remedial Action; provided, however, that Settling Defendant shall not be required to expend more than $5,000,000 on such activities during the period between the completion of Phase 1 dredging and Settling Defendant's notification pursuant to subparagraph 15.c., above.  The costs of maintaining or owning plant and equipment purchased for Phase 1 shall not be included in computing the $5,000,000 figure.  In addition, the $5,000,000 limit shall not include the costs of Settling Defendant's obligations, under other provisions of this Consent Decree, with respect to the performance of Phase 1. Further, if Settling Defendant notifies EPA pursuant to subparagraph 15.c., above, that Settling Defendant will not perform Phase 2, Settling Defendant shall continue conducting water column monitoring pursuant to the Remedial Action Monitoring Plan for three months following such notification, and shall also, in the year following Phase 1, perform the fish monitoring required by the Remedial Action Monitoring Plan.  Each of Settling Defendant's monthly progress reports submitted pursuant to Paragraph 39, below, that covers a month which falls, in whole or in part, within the period from the completion of Phase 1 dredging through Settling Defendant's notification pursuant to subparagraph 15.c., above, shall specify the activities that Settling Defendant performed during such month, or plans to perform during the next two months, in order to prepare for remobilization of contractors and equipment needed to undertake Phase 2, and the cost of such activities. Within 14 days of EPA's request therefor, Settling Defendant shall also provide EPA with copies of invoices, proof of payment, and other appropriate documentation of these expenditures.

17.     If EPA's notification pursuant to subparagraph 15.b., above, is provided to Settling Defendant during the calendar year which immediately follows the year in which the Phase 1 dredging takes place, then, beginning on the date of EPA's notification pursuant to subparagraph 15.b., above (or earlier, if possible) and prior to the deadline for Settling Defendant's notification to EPA pursuant to subparagraph 15.c., above, Settling Defendant and EPA will work together in good faith to identify and select, by mutual agreement, a discrete area(s) where Phase 2 dredging could be conducted in the remainder of that year; provided, however, that:

a.      Dredging in such area(s) during that season will not be at the full Phase 2 production rate, but at a lower production rate to be determined by agreement of the Parties. The production rate shall be sufficient to dredge such discrete area(s) during that dredging season;

b.      EPA's decision regarding changes, if any, to the Phase 1 Engineering Performance Standards, the Phase 1 Quality of Life Performance Standards, the SOW or the scope of Phase 2 does not require fundamental modifications to aspects of the final Phase 2 remedial design plans and specifications that are applicable to the dredging that would be performed during the remainder of that dredging season;

c.      Under this Consent Decree, no dredging shall be required to commence during the calendar year in which EPA provides the notification referred to in subparagraph 15.b., above, if EPA does not approve or finalize by September 1 of that year, the Remedial Action Work Plan for that year (or, as applicable and in accordance with Section 3.1.1.1 of the SOW, revisions and/or addenda to the RA Work Plan for Phase 1 Dredging and Facility Operations), and any necessary revisions and/or addenda to the Approved Design Documents that are applicable to the dredging that would be performed during the remainder of that dredging season;

d.      All necessary governmental approvals for the performance of the dredging that would be done during the remainder of that dredging season are granted prior to the initiation of such work.  Settling Defendant shall make timely requests for any such necessary government approvals; and

e.      The performance of dredging during that dredging season shall not be necessary if it is rendered infeasible by weather constraints or by operational constraints that are beyond the control of Settling Defendant.

18.     If Settling Defendant notifies EPA that it will undertake Phase 2 pursuant to this Consent Decree, and if the Parties agree on an area(s), pursuant to Paragraph 17, for performing dredging in the remainder of that construction season, Settling Defendant shall undertake such work, subject to the conditions in Paragraph 17.  In such event, Settling Defendant shall commence dredging in that area(s) no later than 30 days after Settling Defendant's submission to EPA of the notification required by subparagraph 15.c., above.  If Settling Defendant elects to undertake Phase 2, but the Parties do not agree on an area pursuant to Paragraph 17 or the conditions in Paragraph 17 are not met, Settling Defendant shall begin the Phase 2 dredging in accordance with the applicable schedule in the EPA-approved RA Work Plan for Phase 2 Dredging and Facility Operations (or in any EPA-approved revisions and/or addenda to the RA Work Plan for Phase 1 Dredging that apply to the first complete year of Phase 2).

19.     OM&M.  Settling Defendant shall perform the OM&M in accordance with the SOW, including the OM&M Scope which is included as Attachment E to the SOW, and the EPA-approved plans for the OM&M.

20.     Modification of the SOW or Related Work Plans

a.      Notwithstanding Paragraph 12, and except as provided in subparagraph 20.b., below, if EPA determines that modification to the work specified in the SOW and/or in work plans developed pursuant to the SOW is necessary to achieve and maintain the RA Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD, EPA may require that such modification be incorporated in the SOW and/or such work plans, provided, however, that a modification may only be required pursuant to this subparagraph to the extent that it is consistent with, and would not materially expand, the scope of the remedy selected in the ROD, and to the extent that it would not materially expand the scope of the Work required by the SOW or the attachments thereto, and further, provided that Settling Defendant shall not be required under this Consent Decree to perform Phase 2 of the Remedial Action unless Settling Defendant notifies EPA, pursuant to subparagraph 15.c., above, that Settling Defendant will implement Phase 2 pursuant to this Consent Decree.

b.      If  Settling Defendant notifies EPA, pursuant to subparagraph 15.c., above, that Settling Defendant will implement Phase 2 pursuant to this Consent Decree, and if during Phase 2 EPA determines that modification to the work specified in the SOW and/or in the work plans developed pursuant to the SOW is necessary to achieve and maintain the Phase 2 Engineering Performance Standards or the Phase 2 Quality of Life Performance Standards, EPA may require that such modification be incorporated in the SOW and/or such work plans, provided, however, that a modification may only be required pursuant to this subparagraph to the extent that it is consistent with, and would not materially expand, the scope of the remedy selected in the ROD. Any modification required by EPA under this subparagraph may not require the use of equipment or technology that is not commercially available or that is not consistent with standard engineering and construction practices.

c.      Nothing in this Paragraph shall be construed to limit EPA's ability under subparagraph 15.b. above to require changes to the Phase 1 Engineering Performance Standards, the Phase 1 Quality of Life Performance Standards, the SOW, and the scope of Phase 2, or to limit any rights EPA has under the terms of the SOW itself to require changes to be made to the SOW or work plans developed thereunder.

d.      If Settling Defendant objects to any determination made or modification required pursuant to this Paragraph, it may seek dispute resolution pursuant to Section XIX (Dispute Resolution), Paragraph 83 (record review).  The SOW and/or related work plans shall be modified in accordance with the final resolution of the dispute.

e.      Settling Defendant shall implement any work required by any modifications incorporated in the SOW and/or in work plans developed pursuant to the SOW in accordance with this Paragraph.

21

f.      Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this Consent Decree.

21.     Evaluation of Benefits of Remedy

a.      If Settling Defendant notifies EPA, pursuant to subparagraph 15.c, above, that Settling Defendant will implement Phase 2 pursuant to this Consent Decree, then, after Settling Defendant completes at least two construction seasons of Phase 2 dredging, Settling Defendant may submit to EPA a request for EPA to evaluate whether, in light of the experience gained from Settling Defendant's undertaking of the Work and any data gathered in connection with the Work and associated analysis of such data, the project is making reasonable progress toward achieving its human health and environmental protection objectives, as set forth in the ROD. For purposes of the preceding sentence, a construction season includes a season in which a discrete area(s) is dredged pursuant to Paragraph 17, above. Any such request shall be supported by relevant data gathered in connection with the Work and associated analysis of such data. Following its receipt of Settling Defendant's first request pursuant to this Paragraph, EPA will, based on the experience gained from performance of the Work and data gathered in connection with the Work and associated analysis of such data, evaluate whether the project is making reasonable progress toward achieving its human health and environmental protection objectives and, in light of that evaluation, determine whether the scope of Phase 2 and/or the ROD should be changed. EPA will endeavor to complete such evaluation and make a determination as to whether the scope of Phase 2 and/or the ROD should be changed within five months of EPA's receipt of Settling Defendant's request. EPA's determination pursuant to this Paragraph shall not be subject to dispute resolution under Section XIX of this Consent Decree.

b.      Settling Defendant shall have two hours to make a presentation to EPA in support of its position on what the results of the evaluation should be.

c.      The fact that EPA is in the process of conducting an evaluation pursuant to this Paragraph shall not relieve Settling Defendant of any of its obligations pursuant to this Consent Decree.

d.      If Settling Defendant submits additional requests for evaluation after EPA's decision on the first request, EPA will decide, in its discretion, whether to conduct an additional evaluation. If EPA determines to conduct a further evaluation, the evaluation will follow the requirements of this Paragraph. EPA's determination as to whether to conduct such an additional evaluation shall not be subject to dispute resolution under Section XIX of this Consent Decree.

22.     Settling Defendant acknowledges and agrees that nothing in this Consent Decree, the SOW, or the Remedial Action Work Plans constitutes a warranty or representation of any kind by Plaintiff that compliance with the work requirements set forth in the SOW and the Work Plans will achieve the RA Performance Standards.

23.     Settling Defendant shall annually, prior to any off-site shipment of Waste Material from the Work Area to a waste management facility, provide written notification to the appropriate state environmental official in the receiving facility's state, and to the EPA Project Coordinator and the State, of the anticipated shipments of Waste Material in that year.

a.      Settling Defendant shall include in the written notification the following information, where available: (1) the name and location of the facility to which the Waste Material is to be shipped; (2) the type and quantity of the Waste Material to be shipped; (3) the expected schedule for the shipment of the Waste Material; and (4) the method of transportation. Settling Defendant shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

b.      Settling Defendant shall provide the information required by subparagraph 23.a. as soon as practicable after the award of the contract for disposal and before any Waste Material is actually shipped.

c.      Before shipping any hazardous substances, pollutants, or contaminants from the Work Area to an off-site location, Settling Defendant shall obtain EPA's determination that the proposed receiving facility is operating in compliance with the requirements of CERCLA Section 121(d)(3) and 40 C.F.R. 300.440.  Settling Defendant shall send hazardous substances, pollutants, or contaminants from the Work Area only to an off-site facility that has been determined by EPA to be acceptable for the treatment, storage or disposal of such hazardous substances, pollutants or contaminants pursuant to the statutory provision and regulations cited in the preceding sentence.

## VII. REMEDY REVIEW

24.      Periodic Review.  The long-term monitoring and sampling programs described in the Operation, Maintenance, and Monitoring Scope attached to the SOW have, among their objectives, providing data that will assist EPA in conducting reviews, at least every five years, of whether the Remedial Action is protective of human health and the environment, as required by Section 121(c) of CERCLA and applicable regulations.  In the event that Settling Defendant has notified EPA that it will implement Phase 2 pursuant to this Consent Decree and EPA determines that additional data collection is necessary to undertake the first and/or second periodic review pursuant to Section 121(c) of CERCLA following the completion of the Remedial Action, Settling Defendant shall conduct such additional data collection, as requested by EPA, but shall not be required to expend a combined total of more than $1,500,000 for the additional data collection associated with both such reviews.

25.      EPA Selection of Further Response Actions.  If EPA determines, at any time, that the Remedial Action is not protective of human health and the environment, EPA may select further response actions for the Site in accordance with the requirements of CERCLA and the NCP.

26.      Opportunity To Comment.  Settling Defendant and, if required by Sections 113(k)(2) or 117 of CERCLA, the public, will be provided with an opportunity to comment on any further response actions proposed by EPA as a result of a review conducted pursuant to Section 121(c) of CERCLA, and to submit written comments for the record during the comment period.

27.    Settling Defendant's Obligation To Perform Further Response Actions.  If EPA selects further response actions for the Upper Hudson River, Settling Defendant shall undertake such further response actions to the extent that the reopener conditions in Paragraph 100 or Paragraph 101 (United States' reservations of liability based on unknown conditions or new information) are satisfied.  Settling Defendant may invoke the procedures set forth in Section XIX (Dispute Resolution) to dispute (1) EPA's determination that the reopener conditions of Paragraph 100 or Paragraph 101 of Section XXI (Covenants Not To Sue by Plaintiff) are satisfied, (2) EPA's determination that the Remedial Action is not protective of human health and the environment, or (3) EPA's selection of the further response actions.  Disputes pertaining to whether the Remedial Action is protective, or to EPA's selection of further response actions, shall be resolved pursuant to Paragraph 83 (record review).

28.    Submissions of Plans. If Settling Defendant is required to perform the further response actions pursuant to Paragraph 27, it shall submit, for EPA approval pursuant to Section XI (EPA Approval of Plans and Other Submissions), a plan(s) for such work within 30 days of EPA's request for such plan(s).  Settling Defendant shall implement the plan(s) approved by EPA in accordance with the provisions of this Consent Decree.

### VIII. QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS

29.    Settling Defendant shall use quality assurance, quality control, and chain of custody procedures for all samples collected in connection with the Work, in accordance with "EPA Requirements for Quality Assurance Project Plans" (QA/R5) (EPA/240/B-01/003, March 2001), "Guidance for Quality Assurance Project Plans" (QA/G-5) (EPA/240/R-02/009, December 2002), subsequent updates and amendments to such guidelines upon notification by EPA to Settling Defendant of such update or amendment, or alternate test methods approved by EPA with respect to such sampling, analysis, and data assessment and monitoring; provided that such alternate test methods are consistent with the procedures specified in the Remedial Action Monitoring Scope attached as Attachment B to the SOW, or any modifications thereto that are agreed upon by EPA and Settling Defendant.  Amended guidelines shall apply only to procedures conducted after such notification.

a.    If relevant to the proceeding, the Parties agree that validated sampling data generated in accordance with the Quality Assurance Project Plans (QAPPs) that are submitted by Settling Defendant and reviewed and approved by EPA under this Consent Decree, the RD AOC or the Sampling AOC shall be admissible as evidence, without objection, in any proceeding under this Decree.

b.    Settling Defendant shall ensure that EPA personnel and their authorized representatives are allowed access at reasonable times to all laboratories utilized by Settling Defendant in implementing this Consent Decree.  In addition, Settling Defendant shall ensure that such laboratories analyze all samples submitted by EPA pursuant to the QAPPs for quality assurance monitoring.

c.    Settling Defendant shall ensure that the laboratories it utilizes for the analysis of samples taken pursuant to this Decree perform all analyses according to accepted EPA methods or other methods approved by EPA for the Work.  Accepted EPA methods include, but are not

limited to, those methods which are documented in the "Contract Lab Program Statement of Work for Inorganic Analysis" (ILM05.3 or the latest revision thereof) and the "Contract Lab Program Statement of Work for Organic Analysis," (OLM04.3 or the latest revision thereof), and any amendments thereto (including amendments made during the course of the implementation of this Consent Decree). All QAPPs submitted pursuant to this Consent Decree shall contain Standard Operating Procedures (SOPs) for all methods specified in such QAPPs. Upon approval by EPA, after opportunity for review and comment by the State, Settling Defendant may use other analytical methods which are as effective in achieving the applicable data quality objectives as the currently-approved EPA methods. Settling Defendant shall ensure that all laboratories used by Settling Defendant for analysis of samples taken pursuant to this Consent Decree participate in an EPA or EPA-equivalent quality assurance/quality control ("QA/QC") program. Settling Defendant shall only use laboratories that have a documented Quality System which complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs," (American National Standard, January 5, 1995), and "EPA Requirements for Quality Management Plans (QA/R-2)," (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by EPA. EPA may consider laboratories accredited under the National Environmental Laboratory Accreditation Program (NELAP) and the New York State Environmental Laboratory Approval Program ("SELAP") as meeting the Quality System requirements. If Settling Defendant uses a commercial laboratory for analyses for which NELAP or SELAP certification is available, Settling Defendant shall provide documentation to EPA which demonstrates that each laboratory maintains NELAP/SELAP certification for the specific methods/matrices and analyses to be performed. For each analytical method employed for which NELAP or SELAP certification is not available, Settling Defendant shall provide supporting documentation demonstrating how the method has been verified for all matrices to be analyzed. EPA will review Settling Defendant's supporting documentation and will notify Settling Defendant as to whether such method is acceptable. Settling Defendant shall ensure that all field methodologies utilized in collecting samples for subsequent analysis pursuant to this Decree will be conducted in accordance with the procedures set forth in the approved QAPPs.

30.     Upon request, Settling Defendant shall allow split or duplicate samples of any material, including PE samples and calibration standard materials, to be taken by EPA, the Federal Trustees for Natural Resources, or their authorized representatives. EPA and the Federal Trustees for Natural Resources shall provide copies of the results of the analysis of such samples to Settling Defendant after such results have undergone QA/QC analysis. Settling Defendant also shall allow the State to collect split or duplicate samples of any such material, provided that the State agrees to provide Settling Defendant with copies of the results of the analysis of such samples after those results have undergone QA/QC analysis. Settling Defendant shall notify EPA and the State not less than 14 days in advance of any sample collection activity unless shorter notice is agreed to by EPA. In addition, EPA shall have the right to take any additional samples that EPA deems necessary. Upon request, EPA shall allow the Settling Defendant to take split or duplicate samples of any samples it takes as part of its oversight of the Settling Defendant's implementation of the Work.

31.     Settling Defendant shall simultaneously submit to EPA, the State and the Federal Trustees for Natural Resources copies of the results of all sampling and/or tests or other data

obtained or generated by or on behalf of Settling Defendant that are pertinent to the implementation of this Consent Decree, unless agreed otherwise by the government entity to which such information is to be sent.

32.     Notwithstanding any provision of this Consent Decree, the United States hereby retains all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA and any other applicable statutes or regulations.

## IX. ACCESS AND INSTITUTIONAL CONTROLS

33.     If property at the Work Area, or any other property where access and/or land/water use restrictions are needed to implement this Consent Decree, is owned or controlled by Settling Defendant, Settling Defendant shall comply with the following:

a.      Commencing on the date of lodging of this Consent Decree, Settling Defendant shall provide the United States, the State and their representatives, including their contractors, with access at all reasonable times to all such property for the purpose of conducting any activity related to this Consent Decree, including the following activities:

(1)     Monitoring the Work;

(2)     Verifying any data or information submitted to the United States or the State;

(3)     Conducting investigations relating to contamination at or near the Work Area;

(4)     Obtaining samples;

(5)     Assessing the need for, planning, or implementing additional response actions at or near the Work Area;

(6)     Assessing implementation of quality assurance and quality control practices as defined in the approved Quality Assurance Project Plans;

(7)     Implementing the Work pursuant to the conditions set forth in Paragraph 105 of this Consent Decree;

(8)     Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Settling Defendant or its agents, consistent with Section XXV (Access to Information);

(9)     Assessing Settling Defendant's compliance with this Consent Decree; and

(10)    Determining whether property at the Work Area or other property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted, by or pursuant to this Consent Decree.

The Parties recognize that, for such property, Settling Defendant has adopted or will adopt health and safety and security procedures for visitors, and the Parties will work cooperatively to implement a mutually satisfactory means for EPA's and the State's employees and other representatives to comply with those procedures. Further, all Parties' employees, contractors, and other representatives with access to areas where Work is being performed pursuant to this Consent Decree shall comply with all applicable health and safety plans.

       b.      Commencing on the date of lodging of this Consent Decree, Settling Defendant shall refrain from using such property, to the extent it has been identified, in any manner that would interfere with or adversely affect the implementation, integrity or protectiveness of the remedial measures to be implemented pursuant to this Consent Decree; and

       c.      If EPA so requests, for any such property that is owned by Settling Defendant, Settling Defendant shall execute and record in the Recorder's Office or Registry of Deeds or other appropriate land records office of the appropriate county in the State of New York, an easement/covenant, running with the land, that (i) grants a right of access for the purpose of conducting any activity related to this Consent Decree, including, but not limited to, those activities listed in subparagraph 33.a. of this Consent Decree, and (ii) grants the right to enforce any land/water use restrictions mandated under subparagraph 33.b. of this Consent Decree, or other restrictions that EPA determines are necessary to implement, ensure non-interference with, or ensure the protectiveness of the remedial measures to be performed pursuant to this Consent Decree. Such easement/covenant shall remain in place only for such period as is reasonably necessary to accomplish its purpose. Settling Defendant shall use best efforts to obtain from each holder of a prior lien(s) or encumbrance(s) an agreement to release or subordinate such lien(s) or encumbrance(s) to any easement/covenant requested by EPA pursuant to this Paragraph. Settling Defendant shall grant the access rights and the rights to enforce the land/water use restrictions to one or more of the following persons, as determined by EPA: (i) the United States, on behalf of EPA, and its representatives, (ii) the State and its representatives, and/or (iii) other appropriate grantees. Settling Defendant shall, within ninety (90) days of EPA's request, submit to EPA for review and approval with respect to such property:

       (1)      A draft easement/covenant, in substantially the form attached hereto as Appendix C that is enforceable under the laws of the State of New York, and acceptable under the Attorney General's Title Regulations promulgated pursuant to 40 U.S.C. § 255; and

       (2)      A current title insurance commitment, or some other evidence of title acceptable to EPA, which shows title to the land described in the easement/covenant to be free and clear of all prior liens and encumbrances (except when those liens or encumbrances are approved by EPA or when, despite best efforts, Settling Defendant is unable to obtain release or subordination of such prior liens or encumbrances). Such title insurance commitment or other evidence of title shall be consistent with the U.S. Department of Justice "Standards for the Preparation of Title Evidence in Land Acquisitions by the United States" (2001) or any updated version thereof (the "Standards").